**YAHOO!, INC, Plaintiff,**

v.

**NET GAMES, INC, Defendant.**

**No. C–02–5809 VRW.**

United States District Court, N.D. California.

July 2, 2004.

Scott R. Mosko, Julia Anne Matheson, Kelly, Finnegan, Henderson, Farabow, Garrett, et al., Palo Alto, CA, David M. Kelly, Finnegan, Henderson, Farabow, Garrett, et al., Washington, DC, Michael L. Rodenbaugh, Sunnyvale, CA, for Plaintiff.

## ORDER

WALKER, District Judge.

Plaintiff, Yahoo!, Inc, filed suit against defendant, Net Games, Inc, making a number of claims, including trademark infringement. Doc # 1. On November 25, 2003, the court granted plaintiff's motion for default judgment. Doc # 28. The court also found that plaintiff is entitled to attorney fees under 15 USC § 1117(a). *Id.*

Plaintiff submitted a request for attorney fees in the amount of $31,121.56. Mosko Decl (Doc # 18). Plaintiff requested reimbursement for 52.8 hours at $266 per hour ("/hr") for Jonathan Gelchinsky, 7.7 hours at $494/hr for David Kelly, 13.9 hours at $494/hr for Scott Mosko and 40.4 hours at $152/hr for the legal assistants involved in the matter.

The court rejected plaintiff's request, finding it unsubstantiated and unreasonably high. Accordingly, the court ordered plaintiff to show cause why the court should not award attorney fees at a rate of $150/hr, which was the prevailing market rate for legal services calculated by the court. *Id.* Plaintiff responded to the court's order to show cause in a timely fashion. Doc # 29.

At the outset, the court notes two problems with plaintiff's fee request. First, plaintiff requests $31,121.56 but the requested number of hours multiplied by the requested hourly rates do not total $31,121.56. On the court's calculation, the fee that results from the requested number of hours and hourly rate is $30,856.00. Second, plaintiff requests a rate of $152/hr for all time spent by legal assistants, even though some of the legal assistants bill at rates as low as $90/hr.

## I

### A

■ Attorney fees may be awarded to a plaintiff who demonstrates trademark infringement in "exceptional cases" under 15 USC § 1117(a). To determine a reasonable attorney fee award under section 1117(a), courts employ the lodestar meth-

od. *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210 (9th Cir.2003).

## B

As detailed in the Supreme Court's recent decision in *Gisbrecht v. Barnhart*, 535 U.S. 789, 122 S.Ct. 1817, 152 L.Ed.2d 996 (2002), courts' acceptance of the lodestar method dates from the mid–1970s. See *Id.* at 801, 122 S.Ct. 1817 (collecting cases). The lodestar method "achieved dominance in the federal courts" after three Supreme Court decisions in the 1980s, *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), and *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). See *Gisbrecht*, 535 U.S. at 801, 122 S.Ct. 1817.

Before the lodestar method was developed, the Ninth Circuit applied the twelve-factor test set forth in *Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), to determine attorney fee awards in fee-shifting cases. The lodestar method greatly simplified this analysis by limiting the court's consideration to two factors: the reasonableness of the number of hours and the reasonableness of the hourly rate. In sifting through the remains of the *Kerr* factors, courts have determined that at least five of the *Kerr* factors have been deemed "subsumed in the initial lodestar calculation." *Morales v. City of San Rafael*, 96 F.3d 359, 363–64 (9th Cir.1996). These factors include "(1) the novelty and complexity of the issues, (2) the special skill and experience of counsel, (3) the quality of representation, * * * (4) the results obtained, and (5) the contingent nature of the fee agreement." *Id.* at 364 n. 9 (internal quotation and citations omitted; alteration in original). Although the subsumed *Kerr* factors might be help-

ful in analyzing reasonableness under the lodestar method, the analysis must now focus on what constitutes a reasonable attorney fee in light of case law subsequent to *Kerr*. See *Fischer v. SJB–PD, Inc.*, 214 F.3d 1115, 1119 n. 3 (9th Cir.2000). Indeed, at least one of the "subsumed" *Kerr* factors, "the contingent nature of the fee agreement," has been flatly rejected by the Supreme Court. See *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Furthermore, other "subsumed" *Kerr* factors have been narrowed by Supreme Court precedent subsequent to *Kerr*, as the court explains more fully below.

The lodestar method is a two-step procedure for determining a "reasonable attorney fee." After the court calculates the "lodestar figure" by "multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate," the court then considers whether "it is necessary to adjust the presumptively reasonable lodestar figure on the basis of the *Kerr* factors that are not already subsumed in the initial lodestar calculation." *Morales*, 96 F.3d at 363. Because the lodestar figure is presumptively reasonable, adjustments should be made only in rare cases. *Pennsylvania*, 478 U.S. at 565, 106 S.Ct. 3088. As plaintiff has provided no justification for adjusting the lodestar figure, the court need not reach the second step.

A reasonable attorney fee is the number of hours and the hourly rate that would be billed by "reasonably competent counsel." *Venegas v. Mitchell*, 495 U.S. 82, 86, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990); *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). In *Venegas* and *Blanchard*, the reasonable fee awarded by the district court differed from the fee due under the agreement between the fee applicant and the attorney. In each case, the

party entered into a contingent fee agreement, prevailed on the merits and obtained an award of reasonable attorney fees. In *Blanchard*, the court-awarded fees were greater than the amount due under the fee agreement, whereas, in *Venegas*, the court-awarded fees were less than the amount due under the fee agreement. In each case, the Supreme Court concluded that the fee agreement was enforceable and did not alter the amount awardable as a reasonable attorney fee. *Blanchard*, 489 U.S. at 96, 109 S.Ct. 939 (concluding that the "trial judge should not be limited by the contractual fee agreement between plaintiff and counsel"); *Venegas*, 495 U.S. at 90, 110 S.Ct. 1679 (holding that " § 1988 controls what the losing defendant must pay, not what the prevailing party must pay his lawyer").

■■ Under *Venegas* and *Blanchard*, fee applicants are entitled to an award sufficient to "enable them to secure reasonably competent counsel," but are not entitled to an award "necessary to secure counsel of their choice." *Venegas*, 495 U.S. at 89–90, 110 S.Ct. 1679. Accordingly, courts award the fee that would be charged by reasonably competent counsel, not the fee due under the particular agreement between the fee applicant and its attorneys. Limiting the award to the fee charged by reasonably competent counsel fulfills the aim of fee-shifting provisions, which is to allow parties to employ reasonably competent counsel "without cost to themselves if they prevail." 495 U.S. at 86, 110 S.Ct. 1679. Thus, even if a party chooses to employ counsel of unusual skill and experience, the court awards only the fee necessary to secure reasonably competent counsel.

■ Reasonably competent counsel bill a reasonable number of hours. Reasonably competent counsel do not bill hours that are "excessive, redundant, or otherwise unnecessary." See *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. Additionally, the court must take into consideration discounts commonly given to clients and an attorney's ability to collect fees from its client. As emphasized by the Supreme Court in *Hensley*:

> In the private sector, "billing judgment" is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.

*Id.* at 434, 103 S.Ct. 1933 (internal quotation omitted; emphasis omitted).

Reasonably competent counsel bill at a reasonable hourly rate based on the local legal community as a whole. The Supreme Court's decision in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), is instructive. In *Blum*, the prevailing parties were represented by attorneys from "The Legal Aid Society of New York." 465 U.S. at 891, 104 S.Ct. 1541. The prevailing parties sought attorney fees at hourly rates equivalent to those charged by private counsel. The defendants argued to the Supreme Court that "market rates reflect the level of compensation necessary to attract profit making attorneys, but that such rates provide excessive fees to nonprofit counsel." *Id.* at 893, 104 S.Ct. 1541. The Supreme Court rejected this argument, concluding that a court should not vary its calculation of a reasonable hourly rate whether the "plaintiff was represented by private counsel or by a nonprofit legal services organization." *Id.* at 894, 104 S.Ct. 1541. The Supreme Court also discouraged the use of an attorney's practice area as a basis for distinguishing an attorney fee award. *Id.* at 893, 104 S.Ct. 1541 (requiring that "the amount of fees awarded under [section 1988] be governed by the same standards

which prevail in other types of equally complex Federal litigation, such as antitrust cases") (internal quotation omitted; alteration in original).

Thus, under *Blum,* courts are discouraged from using either an attorney's status as a non-profit, government or private attorney or an attorney's practice area to justify high hourly rates.

■ Although the cases cited above arise primarily in the context of contingent fee agreements in civil rights litigation, "the definition of what is a reasonable fee applies uniformly to all federal fee-shifting statutes." *Anderson v. Director, Office Workers Compensation Programs,* 91 F.3d 1322, 1325 (9th Cir.1996). The lodestar analysis is applied to attorney fee provisions contained in a large number of statutes covering a broad range of subject areas. See, e g, Solid Waste Disposal Act, § 7002(e), 42 USC § 6972(e); Civil Rights Attorney's Fees Awards Act of 1976, 42 USC § 1988; Lanham Act, 15 USC § 1117(a); see also Federal Judicial Center, *Awarding Attorneys' Fees and Managing Fee Litigation* 1 (1994) (noting that by 1994 nearly 200 civil statutes authorized the award of attorney fees). The court has been provided no evidence that Congress intended "reasonable" fees under one statute to exceed "reasonable" fees under another statute. Indeed, a court-ordered award of attorney fees at an above-average rate would send an improper expressive message in that the court would essentially be finding that certain types of cases are more valuable than others.

In sum, a reasonable attorney fee is the fee that would be charged by reasonably competent counsel, not counsel of unusual skill and experience. Reasonably competent counsel bill a reasonable number of hours at a reasonable hourly rate. A reasonable hourly rate is based on rates charged in the local legal community as a whole, not particular segments of the bar.

## C

In the previous subsection, the court demonstrated that a reasonable attorney fee is the fee billed by reasonably competent counsel, not the fee a particular attorney bills a particular client. In almost all cases, including this one, fee applicants provide data about fees charged by a particular attorney, as well as a general statement that such a rate is similar to the rates charged by some subset of attorneys in the area. The court considers how to convert the data typically provided by fee applicants to the data necessary to calculate a reasonable attorney fee.

■ First, the court must determine whether the requested number of hours is greater than, less than or the same number of hours that reasonably competent counsel would have billed. If the requested number of hours is greater than the number of hours reasonably competent counsel would have billed, then the court should reduce the requested number of hours accordingly. See *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933 (describing the court's duty to eliminate hours that are "excessive, redundant, or otherwise unnecessary"). If the requested number of hours is less than the number of hours reasonably competent counsel would have billed, the court should compensate the fee applicant at an above-average hourly rate. If the requested number of hours is the same as the number of hours reasonably competent counsel would have billed, the court should use the number of hours requested.

Second, the court must determine a reasonable hourly rate. Cases describing the lodestar calculation provide little guidance in determining an appropriate hourly rate.

Courts are directed to compare the requested rates with the "prevailing market rate," which is the rate "prevailing in the community for similar services of lawyers with reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895, 104 S.Ct. 1541 n. 11.

Most courts applying this standard come to the general conclusion that a particular attorney's billing rate is relevant, but not dispositive, evidence of a reasonable hourly rate. See, e g, *Guam Society of Obstetricians and Gynecologists v. Ada*, 100 F.3d 691, 702 (9th Cir.1996); *United Steelworkers of America v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir.1990); *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 840 (9th Cir.1982); see also *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 296 (1st Cir.2001) ("[T]he court may take guidance from, but is not bound by, an attorney's standard billing rate."); *Crescent Publishing Group, Inc. v. Playboy Enterprises, Inc.*, 246 F.3d 142, 151 (2d Cir. 2001); *Public Interest Research Group of New Jersey, Inc. v. Windall*, 51 F.3d 1179, 1185 (3d Cir.1995); *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 328 (5th Cir.1995); *Pinkham v. Camex, Inc.*, 84 F.3d 292, 294 (8th Cir.1996); *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332, 1337 (11th Cir.2001) (per curiam); *Covington v. District of Columbia*, 57 F.3d 1101 (D.C.Cir.1995); but see *Mathur v. Bd. of Trustees of Southern Illinois Univ.*, 317 F.3d 738, 743 (7th Cir. 2003) (holding that "[o]nly if an attorney is unable to provide evidence of her actual billing rates should a district court look to other evidence, including rates similar experienced attorneys in the community charge paying clients for similar work.").

Case law provides little guidance in determining what constitutes the "prevailing market rate." *Blum* discourages use of two of the categories most often cited in support of an above-average attorney fee award. These categories are an attorney's status as a private, non-profit or government attorney and an attorney's practice area. For example, fee applicants often attempt to describe the prevailing market rate as the rate charged by attorneys who work for "large and prestigious" private law firms. This is exactly what plaintiff has done here. See Alvary Decl (Doc # 32) at ¶ 3. The prevailing market rate, however, is based on rates charged in the local legal community as a whole, not particular segments of the bar.

Additionally, the purpose of using the prevailing market standard can be misunderstood. The purpose of using prevailing market rates is to estimate the hourly rate reasonably competent counsel would charge. The purpose is not to determine whether or not a specific attorney could command a specific hourly rate in the market. In performing a lodestar calculation, the court ensures that the fee applicant receives, and the losing party pays, a reasonable attorney fee; the court need not ensure that the agreement between the fee applicant and its attorneys provides a fair market rate for the attorneys' services. As stated in *Venegas*, a court's determination of a reasonable attorney fee "controls what the losing defendant must pay, not what the prevailing party must pay his lawyer." *Venegas*, 495 U.S. at 90, 110 S.Ct. 1679.

Accordingly, the average market rate in the local legal community as a whole is a better approximation of the hourly rate that would be charged by reasonably competent counsel than the actual billing rate charged by a single attorney. Like the hypothetical "reasonably competent attorney," attorneys billing at the average rate will not be unusually skilled or experienced but those attorneys typically capable of rendering the required services. Further,

an average market rate combines the rates charged by private, non-profit and government attorneys from a variety of practice areas.

■ While the average market rate normally governs a fee award, an above-average rate may be appropriate in certain situations. A fee applicant should neither be rewarded for hiring expensive legal counsel nor penalized for hiring more efficient legal counsel. Thus, if a fee applicant can demonstrate that its attorneys billed fewer hours than reasonably competent counsel would have billed, the fee applicant should be reimbursed at an above-average hourly rate. See *Blum,* 465 U.S. at 898, 104 S.Ct. 1541. For example, consider a situation in which a court determines that reasonably competent counsel would have billed 10 hours at $100/hr. The fee applicant in such a case would be entitled to $1000 in fees. If the fee applicant in this example were to submit a request for 8 hours, the court should use an hourly rate of $125/hr so that the total fee awarded equals $1000, which is the "reasonable attorney fee."

■ Yet this adjustment to reflect above-average attorney *efficiency* does not suggest that an attorney who, as a result of unusual skill or experience, achieves an above-average *result* for the client also justifies an above-average hourly rate. An attorney who obtains an above-average award for the client might deserve reimbursement at an above-average hourly rate. But, as presently explained, such a premium over the reasonable rate should come from the client, not at the expense of the losing party. An award of reasonable attorney fees "controls what the losing defendant must pay, not what the prevailing party must pay his lawyer." *Venegas,* 495 U.S. at 90, 110 S.Ct. 1679. The losing party is obligated to pay only the rate charged by reasonably competent counsel.

Accordingly, the losing party should not be obligated to pay an above-average attorney fee award simply because the prevailing party obtained an above-average result by employing counsel of unusual skill or experience. Instead, a party that receives an above-average result should be compensated for the work of reasonably competent counsel.

Nor can an above-average hourly rate be warranted on the basis that counsel of unusual skill and experience increase the chance that a party will prevail. The reasoning of the Supreme Court's decision in *City of Burlington v. Dague ("Burlington")*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), supports this principle. In *Burlington,* the Supreme Court held that the lodestar figure may not be multiplied by a "contingency enhancement," which is a multiplier based on the ex ante probability that a party will not prevail.

■ *Burlington* thus supports limiting the reasonable attorney fee award to the hourly rate charged by reasonably competent counsel in primarily two ways. It bears repeating, as *Burlington* emphasizes, that a reasonable attorney fee award "controls what the losing defendant must pay, not what the prevailing party must pay his lawyer." *Venegas,* 495 U.S. at 90, 110 S.Ct. 1679. The respondent argued that the lodestar figure should be enhanced "to reflect the fact that the *party's attorneys* were retained on a contingent fee basis and thus assumed the risk of receiving no payment at all." *Burlington,* 505 U.S. at 559, 112 S.Ct. 2638 (emphasis added). Such an argument is irrelevant because a contingency fee arrangement governs what the prevailing party must pay the attorney; the contingency arrangement does not govern what the court requires the losing party to pay the prevailing party. Accordingly, the court does not adjust the reasonable attorney fee to

be paid by the losing side for the risks in an attorney's litigation portfolio.

Furthermore, "just as the statutory language limiting fees to prevailing (or substantially prevailing) parties bars a prevailing plaintiff from recovering fees relating to claims on which he lost, so should it bar a prevailing plaintiff from recovering for the *risk of loss.*" *Id.* at 564, 112 S.Ct. 2638 (emphasis added). Allowing a contingency enhancement would create unintended problems, including "indiscriminately encouraging nonmeritorious cases" and effectively shifting all of the fee applicant's attorney fees to the other side whether or not the fee applicant prevails. *Id.* at 563, 112 S.Ct. 2638. The essential problem with awarding a contingency enhancement is that it double counts the ex ante probability of losing.

A numerical example might be helpful. Consider 10 cases. In each of these cases, the plaintiff has an 80% chance of succeeding if $10,000 in attorney fees are incurred. From an ex ante perspective, a plaintiff considers what he expects to pay in attorney fees. In a fee-shifting case, the expected payment is the cost of attorney fees against the expected value of an attorney fee award if the party prevails. Without a contingency enhancement, each plaintiff expects to pay $2,000 in attorney fees ($10,000*(0.8)-$10,000 = $8,000-$10,000 = -$2,000). A contingency enhancement can be quantified as the inverse of the likelihood of success (1/0.8). With a contingency enhancement, each plaintiff thus expects to pay $0 in attorney fees ($10,000*(0.8)*(1/0.8)-$10,000 = $10,000-$10,000 = $0).

The ex ante example demonstrates that a contingency enhancement effectively shifts the risk of loss from the plaintiff to the defendant. A risk is the likelihood of an event multiplied by the magnitude of the event. In this example, the ex ante risk of loss is the likelihood of not prevailing (0.2) multiplied by the amount of attorney fees incurred on a losing claim ($10,000). Whether or not a contingency enhancement is used, the plaintiff bears a risk of loss of $2,000 (-$10,000*(0.2)). But if a contingency enhancement is allowed, the risk of loss is offset perfectly by the "risk" of an enhanced attorney fee award ([$10,000*(1/0.8)-$10,000]*(0.8) = [$12,500-$10,000]*(0.8) = $2,000).

This can be seen from the ex post perspective. Assuming that the odds play out, without a contingency enhancement, 8 of 10 plaintiffs would get $10,000 and 2 of 10 would get $0. With a contingency enhancement, 8 of 10 plaintiffs would get $12,500 and 2 of 10 would get $0. As a group, therefore, the plaintiffs recover their total attorney fees ($12,500*8 + $0*2 = $10,000*10 = $100,000). On the other side, the defendants as a group pay the plaintiffs' total attorney fees, the losers' as well as the winners' fees.

Thus, with a contingency enhancement, the defendants individually expect to pay each plaintiff's total attorney fees from an ex ante perspective and as a class do pay the plaintiffs' total attorney fees from an ex post perspective. The Supreme Court described this phenomenon as "indiscriminately encouraging nonmeritorious claims." *Burlington,* 505 U.S. at 563, 112 S.Ct. 2638.

A contingency enhancement impermissibly double counts the ex ante probability of losing. An "enhancement" for the ex ante probability of losing should be applied to the ex ante expected attorney fee recovery, not the ex post award, because once a plaintiff has prevailed, he no longer bears the risk of losing. The ex ante expected award is $8,000 ($10,000*(0.8)). An appropriate "enhancement" would require the court to multiply $8,000 by (1/0.8) to obtain $10,000. A contingency enhancement is

unwarranted because it counts the ex ante probability of losing twice ($8,000*(1/0.8)*(1/0.8)).

Accordingly, *Burlington* bars expressly shifting the ex ante risk of loss through contingency enhancements to the lodestar figure. The reasoning in support of *Burlington* also suggests that padding the lodestar figure to adjust for the risk of loss is also barred. Although the "difficulty of establishing" the merits of a case might support a "higher number of hours" or a "higher hourly rate," the court must avoid unjustly shifting the risk of loss to the losing side. See *Burlington*, 505 U.S. at 562, 112 S.Ct. 2638. It makes little difference to the losing side whether the risk of loss is explicitly shifted by a contingency enhancement or implicitly shifted through incorporating a large number of hours or a high hourly rate into the lodestar figure.

[12] Much of what plaintiff has submitted to support its fee application would lead the court to a result the Supreme Court rejected. The experience of plaintiff's counsel and the high fees charged by the elite segments of the bar, to which plaintiff's papers attest, simply do not bear on the amount of a "reasonable fee."

Rather, these premia reflect what counsel's clients are willing to pay to secure the services of a particular lawyer and thus diminish the risk of loss or for a variety of subjective reasons. Conversely, a lawyer may agree to take on a matter and charge a below-average rate because of the importance of the case, its notoriety and a host of other intangible factors. These considerations are properly reflected in the agreement between the lawyer and the client, but not in the court's award of a fee. A "reasonable fee" award does not necessarily equate to what the client agrees to pay.

In sum, to convert the data provided by fee applicants to a "reasonable attorney fee," the court first compares the requested number of hours to the number of hours that "reasonably competent counsel" would have billed. The court then multiplies the appropriate number of hours by the average market rate, unless an above-average hourly rate is justified by the unusual efficiency of a party's attorneys.

[13] The court acknowledges that the approach outlined in this order focuses more on the requested number of hours for all the attorneys in the case than the hourly rates of the individual attorneys. Focusing on the requested number of hours as a whole rather than the requested hourly rates of individual attorneys produces better attorney fee decisions. An attorney's hourly rate may be based on a host of subjective factors, such as her personality or status as a non-profit, government or private attorney, that are not relevant in calculating a "reasonable attorney fee." The court is in a better position, however, to determine whether the requested number of hours is objectively reasonable because the court has seen the nature of the factual and legal questions in the case, as well as the quality of the attorneys' work. Furthermore, the court is concerned with the overall result obtained, not the particular allocation of labor that a party's attorneys may choose.

## II

Applying the methodology developed in the previous section, the court first considers whether the requested number of hours is greater than, less than or the same number of hours that reasonably competent counsel would have billed.

[14] Plaintiff requests 74.4 hours for services performed by attorneys and 40.4 hours for services performed by legal assistants. Plaintiff did not categorize the number of hours by the tasks performed.

Although the court considers plaintiff's data in the manner presented, the American Bar Association's "Litigation Code Set" provides a more uniform methodology for categorizing requested hours. See American Bar Association ("ABA"), Uniform Task–Based Management System Information, available at http://www.abanet.org/litigation/utbms/home.html. The ABA template commends itself to parties applying for fee awards.

Plaintiff argues that "the factual analysis was detailed and the legal analysis was complex in this matter." Pl Response (Doc # 29) at 3:15. Although attorneys are inclined to describe any case on which they work as complex, this tendency is not infrequently prone to some (maybe a lot of) exaggeration. Such a description applied to this case plainly is an exaggeration. This simply is not a case of unusual complexity.

The court notes that plaintiff has recently obtained trademark default judgments in at least two other cases in the Northern District of California alone. See *Yahoo! Inc v Yahoo Moving & Storage, Inc*, 03–0012 CW; *Yahoo! Inc v. Shapiro*, 02–5620 CW. The frequency with which plaintiff obtains trademark default judgments suggests to the court that these cases are routine, not complex.

The number of hours requested in this case is comparable to the number of hours allowed in a similar case that the court recently considered. In *Jackson v. Sturkie*, 255 F Supp 2d 1096 (N.D.Cal.2003), the court granted a copyright infringement plaintiff's request for attorney fees on default judgment. Just like the plaintiff in *Jackson*, plaintiff seeks attorney fees associated with a default judgment in an intellectual property action. In *Jackson*, the court granted an attorney fee award based on 57.5 hours of attorney time and 10.3 hours of legal assistant time. 255

F.Supp.2d at 1105. Any difference between the number of hours billed in this case and *Jackson* is likely attributable to defendant being located in a foreign country. Accordingly, the court finds the number of hours requested by plaintiff to be roughly the same number of hours that reasonably competent counsel would have billed.

Accordingly, the court finds to be reasonable 74.4 hours of attorney time and 40.4 hours of legal assistant time.

## III

### A

The court now turns to determining a reasonably hourly rate. In two recent orders the court has calculated an average market rate in the local legal community as a whole using public data from the United States Census Bureau and Bureau of Labor Statistics ("BLS"). See *Allen v. BART*, 2003 WL 23333580 (N.D.Cal., July 31, 2003); *Gilliam v. Sonoma City*, 2003 WL 23341211 (N.D.Cal., Dec. 22, 2003). The BLS provides data on the hourly wages earned by attorneys and legal assistants. To estimate the hourly rates billed to clients, the court first calculated the ratio of net receipts to gross receipts from data compiled by the Census Bureau. This ratio was used to approximate the overhead costs that would be incorporated in the hourly rates billed to clients. The court then divided the BLS wage data ($w$) by the ratio of net receipts ($nr$) to gross receipts ($gr$) to determine an estimated average market rate ($r$) as described in the following equation:

$$r = \frac{w}{nr/gr} = w \cdot \frac{gr}{nr}$$

This methodology produced an approximate average market rate of \$150/hr in *Allen* and \$190/hr in *Gilliam*. The court notes that its previous order in this case

was based on the now-outdated data from *Allen.*

The most recent census data describing gross and net receipts by law partnerships is located in "Statistical Abstract of the United States: 2003" ("2003 Statistical Abstract"). See United States Census Bureau, *Statistical Abstract of the United States: 2003,* tbl 733, available at http://www.census.gov/statab/www/. The 2003 Statistical Abstract provides gross and net receipts for the year 2000. Gross receipts totaled $79 billion and net receipts totaled $29 billion. This yields a ratio of net receipts to gross receipts of 0.367. The figures for previous years are presented below in Table 1.

Table 1. Gross and Net Receipt Data from the 2001, 2002 and 2003 Statistical Abstracts of the United States.

| Publication year | Data year | Gross receipts— Partnerships (billion $/yr) | Net receipts— Partnerships (billion $/yr) | Ratio |
|---|---|---|---|---|
| 2001 | 1998 | 66 | 26 | 0.394 |
| 2002 | 1999 | 72 | 27 | 0.375 |
| 2003 | 2000 | 79 | 29 | 0.367 |

The 2003 Statistical Abstract also provides data on gross receipts and net income for "non-farm proprietorships." *Id.* The ratio of net receipts to gross receipts for proprietorships is 0.433. In *Allen,* the court used the ratio from partnerships because it was "a figure more favorable to plaintiff's counsel" and again uses the partnership ratio here. 2003 WL 23333580 at *6.

The court notes that the ratio of net receipts to gross receipts for corporations is 0.071. These numbers were not available in the Statistical Abstract the court used in *Allen* to calculate the average market rate. The court does not use the corporation ratio because it suggests an average market rate of $980/hr, which is clearly incorrect.

The most recent data available from the Bureau of Labor Statistics ("BLS") describing hourly wages in the San Francisco area are located in "CA PMSA–2002 OES Metropolitan Area Occupational Employment and Wage Estimates" ("2002 BLS Wage Estimates"). See United States Dept of Labor, Bureau of Labor Statistics, *San Francisco, CA PMSA—2002 OES Metropolitan Area Occupational Employment and Wage Estimates,* available at http://www.bls.gov/oes/2002/oes—7360.htm. The BLS provides wage estimates for "Legal Occupations" in the year 2002. See *id,* "Legal Occupations." The BLS' estimates for lawyers are a median hourly wage of $64.88/hr and a mean hourly wage of $70.23/hr. *Id.* The BLS' estimates for paralegals and legal assistants are a median hourly wage of $24.64/hr and a mean hourly wage of $25.64/hr. *Id.* The estimated hourly wages for previous years can be found in Table 2.

Table 2. Estimated Hourly Wage Data from the 2000, 2001 and 2002 BLS Wage Estimates.

| | Attorneys | | Legal assistants | |
|---|---|---|---|---|
| Data year | Mean hourly wage ($/hr) | Median hourly wage ($/hr) | Mean hourly wage ($/hr) | Median hourly wage ($/hr) |
| 1998 | 41.93 | 44.91 | 20.77 | 20.41 |

| 1999 | 58.55 | 69.85 | 19.45 | 18.98 |
| 2000 | 50.30 | 50.91 | 24.16 | 23.47 |
| 2001 | 54.01 | 57.33 | 25.42 | 24.4 |
| 2002 | 70.23 | 64.88 | 25.64 | 24.64 |

As in *Allen*, the court selects the higher of the median or mean hourly wage because it is more favorable to the party seeking the grant of attorney fees and defendants have not objected to using the higher number. Alternatively, the court could select the lower of the median or mean hourly wage because the party requesting the attorney fee has the burden of proof. See *Fischer v. SJB–P.D., Inc.*, 214 F.3d 1115, 1121 (9th Cir.2000). But, in this case, the court opts for the former approach.

Dividing the most recent mean hourly wage for lawyers, $70.23/hr, by the most recent ratio of net to gross receipts, 0.367, yields an estimate of $191.32/hr as the average market rate for lawyers in the San Francisco area. Similarly, dividing the most recent mean hourly wage for paralegals, $25.64/hr, by the same ratio, 0.367, yields an estimate of $69.85/hr as an estimated average hourly rate for paralegals in the San Francisco area. The court notes that using the lower of the median and mean hourly wage data yields an estimated average market rate of $176.74/hr for attorneys and $67.12/hr for legal assistants.

The court concedes here, as it did in *Allen*, that the census and BLS data are not likely the "best data available." See *Allen*, 2003 WL 23333580 at *6. Nor does the court contend that its simple methodology could not be refined. The court uses this data because the parties have provided nothing better, even after being expressly directed to the court's decision in *Allen*.

The court rounds the estimated average hourly rates to $190/hr for attorneys and $70/hr for legal assistants. Rounding is appropriate because the court does not want to suggest that its estimate is precise enough to warrant the use of five significant digits. Nor does rounding unduly diminish the fee award due the fee applicant. The court gave the fee applicant the higher of the mean and median hourly wages estimated by the BLS. For attorneys, choosing the higher number resulted in an hourly rate, before rounding, of $191.32/hr instead of an hourly rate of $176.74/hr. For legal assistants, choosing the higher number resulted in an hourly rate, before rounding, of $69.85/hr instead of $67.12/hr.

The court notes that the BLS data have been criticized, in another case, on the grounds that the data underestimate the average market rate because the data "do[ ] not include the self employed owners and partners in unincorporated firms * * *." See United States Dept of Labor, Bureau of Labor Statistics, *Technical Notes, 2002 BLS Wage Estimates*, available at http://www.bls.gov/oes/2002/oes—tec.htm. The court finds this criticism unpersuasive because it is unclear whether incorporating partner statistics would cause the average market rate to increase. Although partners at large private law firms likely make more than the average market rate, many solo practitioners likely make less than the average market rate. It is not clear how inclusion of self-employed owners and partners would affect the data.

The data have also been criticized on the basis that they do not include the mark-up required to motivate the owners of for-profit firms. The court finds this criticism

unpersuasive because the court, as *Blum* instructs, determines a reasonable attorney fee without regard to an attorney's status as a private, non-profit or government attorney.

Accordingly, the court uses $190/hr for lawyers and $70/hr for paralegals as an approximate average market rate.

### B

█ Plaintiff's response to the court's order to show cause reiterates the request for attorney fees in the same amount as previously requested. See Pl Response (Doc # 29). In addition to an affidavit prepared by an attorney, plaintiff bases the fee request on the declarations of two persons who claim expertise in the rates attorneys bill in the San Francisco area. These declarations emphasize the skill and experience of plaintiff's counsel in arguing that an above-average rate is warranted.

Delia Swan is the owner of a legal recruiting firm. Swan Decl (Doc # 31) at ¶ 1. Swan has experience placing associates and partners with new firms in the San Francisco area. *Id.* at ¶ 2. Swan offers the opinion, based on her experience, that "the rates for which Finnegan Henderson has billed Yahoo! for this matter are easily within the range of rates I understand law firms with significant intellectual property practices charge." *Id.* at ¶ 4.

Paula Alvary is a consultant to law firms, who regularly examines the billing rates of attorneys at law firms in the San Francisco area. Alvary Decl (Doc # 32) at ¶¶ 1–2. Alvary distinguishes "large and prestigious firms" from the general legal community. *Id.* at ¶ 3. Alvary claims that at large and prestigious law firms associates with a 2002 law degree command roughly $200/hr and associates with a 1997 law degree command roughly $400/hr. *Id.* at ¶ 3. Partners with greater than twenty

years billing experience at such firms command a fee ranging from $400–600/hr. Further, intellectual property practitioners tend to bill at the high end of this range. *Id.* at ¶¶ 3–4. She offers her opinion that the billing rates requested by plaintiff in this matter are reasonable. *Id.* at ¶ 6.

The court finds the opinions offered by these declarants essentially beside the point. Both declarants base their decisions entirely on billing rates; nothing is said about discounts given clients, write-offs of time, collection experience or the host of other matters that determine the attorney fees that actually prevail in the market.

Moreover, Alvary relies on a distinction between "large and prestigious firms" and the general legal community. *Id.* at ¶ 3. Because the court cannot base a reasonable attorney fee on an attorney's status as a private, non-profit or government attorney, the court concludes that Alvary's distinction between lawyers at so-called "large and prestigious firms" and lawyers at "small and low-ranking firms" has no legal significance. See *Blum*, 465 U.S. at 895, 104 S.Ct. 1541 n. 11 (first quotation); Alvary Decl (Doc # 32) at ¶ 3 (second quotation).

Clients, in the private market for attorney services, may attach economic significance to a distinction between "large and prestigious firms" and other law firms. But whether courts, which are required to award only a "reasonable attorney fee," should attach legal significance to such an amorphous (and generally self-serving) distinction is quite another thing.

To be clear, the court does not doubt the skill and experience of plaintiff's counsel. The court merely questions the relevance of their skill and experience to the court's determination of a "reasonable attorney fee" in this case. As described above,

plaintiff is entitled to an above-average hourly rate if it can demonstrate that its counsel were more efficient than reasonably competent counsel would have been. Plaintiff has made no such showing.

Accordingly, the court deems it appropriate to award plaintiff attorney fees for the time spent by its attorneys at the average market rate, which the court calculates to be $190/hr.

### C

Plaintiff also requests that fees be awarded for the work of a number of legal assistants. Under analogous fee-shifting statutes, the Supreme Court has held that the fees of paralegals may be recovered. *Missouri v. Jenkins,* 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). Accordingly, the court concludes that the work of legal assistants may also be recovered in this case.

Scott Mosko declares that Laurie Hupman acted as the "primary legal assistant" in this case, although she received "occasional assistance" from other legal assistants. Mosko Decl (Doc # 15) at ¶ 6(d). Mosko further declares that Hupman's billing rate is $152/hr and that the rates of the other legal assistants range from $90/hr to $152/hr.

The court finds plaintiff's showing insufficient. Plaintiff does not separate the hours billed by Hupman at the high-end rate of $152/hr and the hours billed by other legal assistants at substantially lower rates, such as $90/hr. Moreover, for the reasons set forth above, merely reciting Hupman's high-end billing rate does not suffice to demonstrate a reasonable hourly rate for purposes of the lodestar analysis.

Accordingly, the court deems it appropriate to award fees for services performed by legal assistants at the average market rate, which the court calculates to be $70/hr.

### D

Accordingly, the court finds the following award to be justified: 74.4 hours at $190/hr for the attorneys Gelchinsky, Kelly and Mosko and 40.4 hours at $70/hr for the legal assistants. The total is thus $16,964.00.

### IV

In sum, the court GRANTS plaintiff's reasonable attorney fees in the amount of $16,964.00. Because this order resolves the last outstanding issue in the case, the clerk is DIRECTED to close the file, terminate all pending motions and amend the previously entered judgment to include an award of attorney fees in the amount of $16,964.00.

IT IS SO ORDERED.